## ROBERT M.' CHATTERTON AND JOHN H. CHATTERTON *vs.* JOHN T. MASON, R., AND JOHN HINKLEY, RECEIVERS, AND OTHERS.

*Fraudulent Conveyances—Rights of Creditors of Grantor—Rights and Liabilities of Grantee who has Paid a Consideration—Subrogation of Grantee to Claims of Creditors Paid by Him—Testimony in Equity Cases—Proof of Claims—Prayer for General Relief.*

A deed and bill of sale made and accepted by the grantee with intent to delay or defraud the existing creditors of the grantor will be vacated, although the grantee therein paid full value for the property. As against creditors, a transfer of property must be *bona fide* as well as for value.

A man indebted to different creditors to a large amount sold and conveyed his visible and tangible property to his father who had knowledge of the facts and aided his son in putting the property out of the reach of creditors. Some of the money so obtained was used in paying certain creditors who had issued attachments against the son or threatened to have him adjudged an insolvent, and part of the money was concealed. Some of the property was afterwards turned over to a corporation of which the son was general manager. *Held,* that the conveyances were fraudulent and void as to the creditors of the son who were such at the time of the transfer.

A debtor in failing circumstances conveyed all his visible property to his father for the purpose, participated in by both, of delaying and hindering the creditors of the former. The purchase money was paid. Part of the property had been previously attached by a creditor and a certain sum was paid by the grantee to release the attachment. The grantee also paid certain other creditors of the grantor. Upon a bill to vacate the conveyances, *Held,*

1st. That although the conveyances were void as to creditors yet the grantee should not be ordered to pay into Court the entire value of the property conveyed to him, without any deduction for the payments made by him to creditors.

2nd. That if the attachment was valid and the payment of the attaching creditor necessary, then the grantee should be allowed a credit for that sum, because such allowance does not make the position of the other creditors any worse than it would have been if the debtor had made an assignment for the benefit of creditors after the attachment was laid.

3rd. That the grantee is entitled to be subrogated to the distributive shares of the other creditors whose claims he paid, the amount to be ascertained by an audit showing the percentage payable to each creditor.

4th. That the grantee is not entitled to be credited with the amounts he or his son paid to creditors who issued attachments after the conveyances were made, or to those who instituted or threatened insolvency proceedings, beyond what their distributive shares may be.

5th. That the grantee is not entitled to deduct from the fund money paid by him for counsel fees or for the personal expenses of his son.

6th. That the creditors are not limited in their recovery to the purchase money paid by the grantee for the goods, if it can be proved that they were worth more.

Upon a bill to vacate certain conveyances because fraudulent against creditors, the depositions were closed and returned to Court by the examiner at the direction of all the solicitors. After the case had been regularly heard an order was passed remanding the same to the examiner solely for the purpose of enabling plaintiffs to offer additional proof of their claims. On the same day that the testimony was returned with such proof, a final decree was passed vacating the conveyances. Equity Rule 43 requires testimony in equity cases to lie in Court for ten days before a hearing. *Held*, that the rule does not apply to testimony taken under these circumstances ; that the Court had a right to limit the additional testimony to proof of claims, subject to the right of other parties to offer evidence in rebuttal, upon application to the Court for that purpose.

Certified copies of judgments against the defendants are sufficient evidence of the claims of the plaintiff.

The relief that may be given under a prayer for general relief must be agreeable to the case made by the bill and not differing from it or inconsistent with it, and must be warranted by the allegations of the bill.

Upon a bill to vacate conveyances because fraudulent as against creditors, where the grantee has paid value for the same, which does not ask that he be directed to repay such value, no personal decree can be had against the grantee for the value of the goods when there is no allegation in the bill giving him notice that such claim would be made.

Appeal from the Circuit Court of Baltimore City (DEN-NIS, J.)

The cause was argued before McSHERRY, C. J., BRYAN, PAGE, ROBERTS and BOYD, JJ.

*Julian J. Alexander* and *D. Meredith Reese*, for the appellants.

*John Hinkley* and *Joseph C. France*, for the appellees.

BOYD, J., delivered the opinion of the Court.

The bill was originally filed in this case by William H. Castle, C. O. Baxter and Company, and Glanton and Cotton, against John H. Chatterton and Robert M. Chatterton. It alleges that the firm of Newkirk and Roth on the 10th day of January, 1894, issued an attachment against John H. Chatterton, which was levied on certain goods and chattels ; that John H. Chatterton, by deed of January 11th, 1894, conveyed to his father, Robert M. Chatterton, for the alleged consideration of one thousand dollars, two lots of ground in Baltimore City and transferred to him by a bill of sale, certain goods and chattels, for an alleged consideration of eight thousand dollars ; that on the 8th day of May, 1894, the plaintiffs issued executions on judgments obtained by them, respectively, on the 25th day of April, 1894 ; that said William H. Castle had filed, or was about to file, a motion to quash the attachment; that by reason of said judgments and executions they had acquired liens on all the property mentioned in the deed and bill of sale, subject to the decision of said motion to quash, and to the result of this bill. They then charge that the deed and bill of sale were made by John H. Chatterton and received by Robert M. Chatterton " for the purpose of hindering, delaying and defrauding the plaintiffs and others who are creditors of the said John H. Chatterton, and who were so at the time of the making of said deed," and require the defendants " to answer fully and particularly and discover and show upon

what considerations the said deeds were made, and for what reasons, purposes, trusts, confidences and whether there was any agreement or understanding between the said defendants in regard to the payment of said creditors or in regard to the reconveyance of said property to said John H. Chatterton," etc. The prayers are that " (a), defendants may answer this bill; (b), that they may discover and show the matters and things hereinbefore required of them; (c), that said two deeds may be declared void as against the plaintiffs and other creditors of said John H. Chatterton, who may come into the case; (d), and that the plaintiffs may have such other and further relief as the case may require." With the bill were filed certified copies of the deed and bill of sale and short copies of the three judgments. The defendants filed separate answers, but they are practically the same. They admit the execution of the deed and bill of sale, but deny that they were executed to hinder, delay and defraud the creditors of John H. Chatterton, and allege that they were *bona fide* and for the considerations named in them. They say they were not made upon any trusts or confidences and that there is no agreement or understanding between them in regard to the payment of the creditors or the reconveyance of said property to John H. Chatterton. They neither admit nor deny that the judgments were obtained and executions issued as alleged, but call for full proof of the same and deny that any lien had been acquired by them on said property. On April 30th, 1895, four other creditors obtained permission to be made parties. Two of them filed short copies of judgments, another filed a copy of a note and the other copies of three notes. The plaintiffs commenced to take testimony by calling John H. Chatterton and afterwards called Robert M. Chatterton. On September 26, 1896, the examiner, at the request of the solicitors of the respective parties, closed the depositions and returned them to the Court—only the two Chattertons having been examined. In October of that year fourteen other parties filed a petition, alleging that they were creditors, and

asking to be made parties, which was done, and several others were admitted as parties on other orders. The case was finally set down for hearing and after argument the Court passed an order remanding the cause to the examiner " to the end that the respective parties complainant in the said cause shall offer before him lawful proof of their respective claims against the firm of John H. Chatterton and Company, and for no other purpose." The next day the examiner returned the testimony, which consisted of certified copies of the judgments of such creditors as had judgments, including those of the original plaintiffs, the promissory notes and open accounts of others who had been made parties, and the deposition of one witness who testified that he believed that all the notes filed were signed by J. H. Chatterton, with the exception of one ; that all the claims had been admitted by J. H. Chatterton to be proper claims against the firm of J. H. Chatterton and Company. J. H. Chatterton traded in that name but had no partner. The same day the Court passed a final decree, declaring the deed and bill of sale fraudulent and void as against the creditors of John H. Chatterton, who were such on the 11th day of January, 1894, and appointing receivers to take charge of the real and leasehold estate, and to collect from Robert M. Chatterton the sum of $9,490.00, being the sum of $8,000.00, the value of the chattels as found by the Court, with interest from January 11, 1894. The decree recited that it appeared that personal property of the value of $8,000.00 had been delivered to Robert M. Chatterton and by him disposed of, and directed him to pay the said sum of $9,490.00 to the receivers.

Assuming that there was sufficient evidence to show that the several debts due the plaintiffs had been contracted prior to the making of the deed and bill of sale, the facts justified the Court below in setting them aside. The *bona fides* of the transfer of property is as much a subject of inquiry in a case of this character as the consideration. If it be established that the deed was made by the grantor and accepted

by the grentee, with intent to hinder, delay and defraud the
creditors of the former, it matters not that full consideration
has been paid.    A consideration may for the time being
hide a fraud, but it will not protect the participants in a
fraudulent transaction when once discovered.  The difficulty
oftentimes is to determine the intent with which an act is
done, but, in reaching a conclusion as to that, Courts must
be governed by all the facts and surrounding circumstances.
When a result is reached which an ordinarily intelligent per-
son must have foreseen, he will generally be presumed to
have intended that such result would follow his act.    In this
case the purchase of the property of John H. Chatterton,
by his father, Robert M. Chatterton, and the payment of
the purchase money, must, under the circumstances, neces-
sarily have resulted in interfering with the creditors of the
former in securing their claims, or such part thereof as his
property would meet.   No surer means could have been
adopted than by converting tangible property, that could be
reached by process of law, into cash that could be stored
away in boxes of safe deposit companies, rented in fictitious
names, as was done in this case, or otherwise concealed.
The fact was that John H. Chatterton owed over forty thou-
sand dollars and had according to the valuation fixed by his
father and himself nine thousand dollars worth of property.
That *he* was seeking to place his property beyond the reach
of his creditors is too clear for controversy.    He cannot ex-
cuse himself by alleging that the claims on which the attach-
ments were issued were not due.    If that was true, and if
they had no right to attach by reason of some fraudulent act
of his, the attachments could have been defeated.   If his
object was to protect his creditors, he could have made an
assignment for their benefit.    But he not only did not do
that, but according to his statement he used a considerable
part of the money he received from his father in settling the
attachments, although he claims they were illegally issued.
By converting his property into cash, he was enabled to pay
only such creditors as he chose to pay and if we look at the

petition of the defendants filed after the decree, he seems to
have chosen to pay only such as had attached the property
or were endeavoring to throw him into insolvency.

The father, however, denied that he knew the amount of
the indebtedness of his son or that he was a party to any
fraud. An attachment had been issued against the son and
levied on the stock of goods, or a part of it, and the father
was present when the levy was made. He said he was in
the habit of going to his son's place very often, " perhaps
once or twice or three times a week, when I happened to
be in town." In answer to the question, " At whose instance
did you make this alleged purchase?" he said, " I can't say
that it was made at any one's instance. It was a natural
result of the circumstances." The attachment issued before
his purchase was for over two thousand dollars, and he was
apparently indifferent as to the result of it. It was issued
January 10th, 1894, and the deed and bill of sale were exe-
cuted the next day and filed for record at 9.40 A. M. of that
day. Was such haste to be expected of a father dealing
with a son if he was not seeking to record these instruments
before other creditors proceeded? When we see how far
he trusted his son to protect the property for which he had
paid the $9,000.00 we can reach no other conclusion as to
the cause of the haste in recording the instruments, than
that he was anticipating proceedings by other creditors. His
own testimony shows he knew that other claims against his
son would soon mature. He said a calendar was kept on
the desk with the payments of each day marked on it, and
he looked over it and found that every payment had been
marked out or paid up to that date. He was asked, " You
say that you looked at the calendar. Did you examine it
for the payments noted there for the balance of the current
month?" To which he replied, " Yes." He was then asked,
" What did you see?" He replied, " I saw that there was
payment to be made for the balance of the month." And
in answer to the question, " Did you make any provision
for the payment of these maturing claims in the deal which

you had with your son," he replied, "No further than that the money he had would meet them, the amount of money I paid him." He also said that he did not remember that he had made any inquiry of his son as to his indebtedness before he made the purchase. The subsequent conduct of both defendants throws considerable light on the transaction. In June, 1894, the Chatterton Manufacturing Company was incorporated with an authorized capital of $20,000.00. Robert M. Chatterton was made president, John H. Chatterton, secretary and general manager, and his brother treasurer. Only $9,300.00 of the capital was paid, which was done with cash and stock according to the evidence of John H. Chatterton on cross-examination, although he had previously sworn it was paid for in money. He was asked the question, "Was not $9,000.00 paid in the same stock of goods that you have turned over to your father and the remaining $300 in cash?" To which he replied, "Won't answer that question." He had, however, admitted that the company did use a good many of the goods that he had when he made the deeds to his father. Robert M. Chatterton was asked what became of the stock of goods purchased from his son, and he declined to answer. He was also asked how much of that stock of goods was transferred to the Chatterton Manufacturing Company, but he declined to answer that and also the question as to how he paid for his stock in that company. We thus find that at least a part, and we might well conclude from the refusal of these parties to answer that the greater part, of the goods and chattels purchased by the father, in the course of a few months returned to the control of the son, as manager of the corporation, and find the father, when accused of participating in the fraud, refusing to answer such questions as those stated above. An innocent man resting under such charges would be glad to have the opportunity of explaining fully all his connection with the transaction. The results in this case show how easy it would be for a debtor to pay as many, or as few, of his creditors as he chooses to

pay, if such transactions are to be upheld, especially when such relationship as father and son exists.   Robert M. Chatterton certainly knew he was putting it in the power of his son to do just what he did do—take the money under his own control and do with it as he pleased.   Taking all the facts and surrounding circumstances into consideration, we think the Court below was right in determining that the transaction was fraudulent and void as against the creditors of John H. Chatterton, who were such on the 11th day of January, 1894.

But it is contended that there was no legal evidence of the plaintiff's claims in the case when the decree was passed, because the testimony taken on February 20, 1897, did not lie in Court subject to exception for ten days, as required by Equity Rule 43, now section 223 of Art. 16 of the Code. It was within the discretion of the Court to permit the plaintiff to offer lawful proof of their claims and from the exercise of that discretion there could be no appeal.   And we think the Court had the right to limit the taking of the testimony to that particular purpose.   The order of the Court stated :  " and upon the filing with said examiner of such formal proofs of said parties complainant as aforesaid, he, the said examiner, is hereby directed to return forthwith the papers and testimony of the said cause, with the claims proven as aforesaid to this Court, for the passage of a final decree in the premises."   No further hearing of the case was intended, and therefore the Equity Rule above referred to, requiring evidence to remain in Court ten days, subject to exceptions, before the cause shall be taken up for hearing, did not apply.   The solicitors for the respective parties were before the examiner—in fact the testimony was taken in the office of one of those for the defendants.   They knew what the order of the Court was, or must be presumed to have known it, as the testimony was taken under it, and if they desired to rebut the evidence offered by the plaintiffs they should have at once made application to the Court for leave to take such testimony, and they could have excepted at

once to that taken by the plaintiffs. But they did not do either, although the return of the examiner shows that he closed the depositions at the request of the solicitors of the respective parties. The decree was passed the same day, and four days after Robert M. Chatterton filed a petition to strike out and annul the decree and to quash an execution that had been in the meantime issued against him. The petition relied entirely upon Equity Rule 43 and does not state or suggest that he desired to take further testimony or except to that taken. On the 8th day of March the two defendants filed another petition in which they set out what was done with the $9,000.00 and ask that Robert M. Chatterton be allowed for payments made to creditors of John H. Chatterton, with said money, but do not then ask leave to take testimony in rebuttal of that taken by the plaintiffs. So although we think it would be the duty of a Court which remanded a cause for further testimony to be taken in the interest of one side to allow the other side to rebut or explain it, if proper application be made, yet if that be not done, such party has no reason to complain. We think the copies of the judgments of the original plaintiffs certified by the clerk under the seal of the Court were sufficient to prove the recovery of such judgments, and there were no exceptions filed to them. It is not necessary to refer to the claims of the plaintiffs who were admitted after the bill was filed, as the decree does not necessarily establish their validity, and it would be necessary that the claims of one or more of the original plaintiffs be established to entitle them to a decree.

We had some question as to whether it was sufficiently shown that the debts on which these judgments were rendered existed at the time the deeds were made, but we think John H. Chatterton's testimony sufficiently establishes that fact. He testified that he sold out the business he was engaged in as J. H. Chatterton and Company to his father on January 11, 1894, the date of the deeds, and he spoke of the amount he owed at that time. These claims were against

J. H. Chatterton and Company and must have been contracted before he sold out the business. Whilst it might have been made clearer by proof of the exact dates the debts were contracted, we are satisfied from the evidence that they existed before the deeds were made.

So much of the decree then as declared the deed and bill of sale void we think was properly passed. But we are of opinion that there was error in that part which decreed payment by Robert M. Chatterton of the sum of $9,400.00. We have quoted above the prayers of the bill, and it is manifest that the payment of this sum could not have been decreed under the special prayers. The general rule is that the relief to be given under a prayer for general relief must be agreeable to the case made by the bill and not differing rom it or inconsistent with it, and *must be warranted by the allegations of the bill.* The authorities in this State will be found collected in the recent work of *Miller on Equity Procedure,* secs. 100 and 101, and need not be repeated here. The bill alleges that the plaintiffs had acquired liens on the property conveyed by the deeds, subject to the decisions of the motion to quash the attachment, and asks to have the deed and bill of sale set aside as fraudulent and void against the creditors of John H. Chatterton. It is nowhere intimated that a personal decree would be asked against Robert M. Chatterton for the purchase money paid by him for the goods and chattels, with interest thereon, and there were no allegations in the bill that could have informed or given him notice that any such claim would be made. The bill alleges that under the attachment issued the day before the deed and bill of sale were executed goods valued at $4,495.95 had been levied on. They were a part of the goods purchased by Robert M. Chatterton. There is nothing in the record to show that he was in anywise responsible for that attachment and if it was properly issued, or if it was necessary to settle with the plaintiffs to free the property from the attachment, it would be manifestly unjust to charge him with the entire value of the property without deducting what

was necessarily paid to release the attachment. He was entitled to some notice that the plaintiffs in this case would seek to hold him responsible for the entire value of the property and to show, if he could, that he was entitled to credits on it. When it was discovered by the plaintiffs that the property had been sold or disposed of, they should have applied to the Court for leave to amend their bill, if they desired to get a personal decree against Robert M. Chatterton, and have made the necessary allegations to obtain a decree of that character. He could then answer it and offer evidence of any credits he may be entitled to and might possibly show that some of the goods taken under the attachment never came into his possession.

As the case must be remanded it will be proper to indicate our views as to how far he is entitled to credits for payments made creditors with money furnished by him, so far as we are informed by the record. In the first place he should be allowed for what was necessarily paid Newkirk and Roth, who had attached the property prior to his purchase. The Court should be satisfied that they had such a standing in Court as to make a settlement of their case necessary or proper. Such a credit would undoubtedly be equitable, as the plaintiffs and other creditors would be in no worse position when that is allowed than they would have been if John H. Chatterton had made an assignment for their benefit after the attachment was laid.

Then he would be entitled to the distributive shares of any other creditors that were settled with out of money paid by him. For illustration, if the claims of all the creditors of John H. Chatterton, when the deed and bill of sale were made, amounted to $40,000.00 exclusive of Newkirk and Roth's claim and there is $7,200, for distribution, after deducting costs and any amount properly paid Newkirk and Roth as above indicated, there would be a distribution of eighteen per cent. to each of the creditors. Robert M. Chatterton would then be entitled to a credit of that percentage on all proper claims of the creditors of John H. Chat-

terton which had been paid or settled with out of the money furnished by him, provided he paid at least that amount in such settlements. If the evidence shows that there was no necessity to settle with Newkirk and Roth, but that the attachment had been improperly issued and could probably have been defeated, then he would only be entitled to a credit on that claim for whatever the distributive share will be, of all creditors, after that claim is added. Of course the burden is on Robert M. Chatterton, to show that his money was paid to such creditors as he may get credit for, as well as that they were *bona fide* creditors of John H. Chatterton when the transfers were made.

He is not entitled to be credited with the amounts he or his son saw proper to pay to the creditors who attached after the deed and bill of sale were made, or to those who instituted or threatened insolvent proceedings, beyond what their distributive shares may be. Nor is he entitled to deduct out of this fund counsel fees paid by him or his son and of course he cannot deduct any amount expended by his son for living expenses. We think the above equitable and in line with *Millholland* v. *Tiffany*, 64 Md. 465, and *Cone* v. *Cross*, 72 Md. 102.

The practical difficulty we see in the way of these allowances is that it may be impossible to tell before an audit is made how much the distributive shares to which Robert M. Chatterton is entitled to be subrogated will amount to, and an audit cannot be made until the money is paid. If such be the case, the Court in passing a personal decree should require him to pay in the whole amount found to be due, after deducting the amount allowed on account of the Newkirk and Roth attachment, and any other amounts that he may be able to show should properly be deducted, if there be any such. Then there can be distributed to his use such amounts as the creditors who were settled with out of his money would have been entitled to, if they had not been thus paid or settled with, which should be returned to him. Of course the plaintiffs are not limited in their recovery to

the purchase money Robert M. Chatterton paid for the goods, if they can show they were worth more.

The decree will be affirmed in so far as it declares the deed and bill of sale fraudulent and void as to all creditors of John H. Chatterton, who were such on the 11th day of January, 1894, and appoints receivers, but that part of it requiring Robert M. Chatterton to pay the sum of $9,490.00 must be reversed for the reasons we have given. The bill can be amended to meet our views as to the necessity of a special prayer to require the payment of such amount as may be found to be due, if the goods cannot be recovered.

> *Decree affirmed in part and reversed in part, and cause remanded, each party to pay one-half of the costs.*